## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 23 2015, 9:04 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Roger L. Pardieck
Karen M. Davis
The Pardieck Law Firm
A Professional Corporation
Seymour, Indiana

ATTORNEYS FOR APPELLEE

Scott L. Tyler
Eric T. Eberwine
Waters, Tyler, Hofmann & Scott, LLC
New Albany, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Virginia L. Bishop, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Dennis Parks d/b/a Dennis Parks & Son, <br> *Appellee-Defendant* | October 23, 2015 <br><br> Court of Appeals Case No. 39A05-1411-CT-533 <br><br> Appeal from the Jefferson Circuit Court <br><br> The Honorable Darrell M. Auxier, Judge <br><br> Trial Court Cause No. 39C01-1012-CT-702 |

**Crone, Judge.**

# Case Summary

Dennis Parks d/b/a Dennis Parks & Son was backing up his Mack dump truck when he ran over Virginia L. Bishop who was working as a flagger at a construction site. Bishop filed a negligence action against Parks. At the jury trial, Parks introduced part of the investigating officer's police report. The trial court admitted that part of the report over Bishop's objection. The jury found that Bishop was 80% at fault. Bishop filed a motion to correct error and for a new trial, arguing that the police report was inadmissible hearsay. The trial court found that any error in the admission of the report was harmless and denied her motion.

Bishop appeals, arguing that the trial court abused its discretion in admitting part of the police report and that its admission prejudiced her substantial rights. We conclude that any error in the admission of the police report was harmless, and therefore we affirm.

# Facts and Procedural History[1]

In April 2010, Dave O'Mara Contractor, Inc., was overseeing a road construction project to widen Indiana State Road 62 in Jefferson County. The construction site was immediately adjacent to S.R. 62. Parks worked for O'Mara as an independent contractor operating a Mack dump truck to haul dirt

---

[1] Parks presents his statement of facts as a witness-by-witness summary of the testimony rather than in a narrative form as required by Indiana Appellate Rule 46(A)(6)(c).

away from the construction site. Multiple dump trucks entered the construction site to be loaded with dirt and haul it away. The dump trucks entered the construction site from S.R. 62, backed into a staging area, and waited until the excavator was ready with a load of dirt. Once the excavator loaded its bucket, it would swing the bucket around to the loading area and raise the bucket. The raised bucket unambiguously signaled to the truck driver that the excavator was ready to load the truck, and the driver backed the truck into position to be loaded. However, the excavator did not always signal to the truck drivers, and it was common for the trucks to back into the loading area before the excavator swung the bucket around. The construction workers understood that the process of loading the dump trucks was to be completed quickly. When the dump truck was loaded, the truck would get back on S.R. 62 to transport the load away.

[4] Parks could not see directly behind his dump truck. Parks's truck was equipped with a backup alarm that came on when the truck was in reverse. Parks was a certified mechanic, and he had hooked his backup alarm to a toggle switch in the cab that allowed him to deactivate the alarm. The purpose of the alarm is to alert workers that the truck is backing up so that they can get out of the way. Multiple alarms were often heard simultaneously at the construction site.

[5] Bishop was employed by O'Mara as a flagger at the construction site. Her job was to stop traffic on S.R. 62 so that the loaded dump trucks could exit the construction site and get back on S.R. 62. She also directed traffic coming in and out of local businesses adjacent to the construction site, so that the dump

trucks could proceed to be loaded if the excavator was ready. If the excavator was not ready, she directed the truck driver to remain stationary and permitted local traffic to pass. Bishop did not direct the trucks to the excavator unless there was other traffic present. Bishop had received flagger safety training from the American Traffic Safety Services Association. Bishop was taught that flaggers should remain in full view of all vehicles, that it was unsafe to stand behind equipment like dump trucks, and that she should not turn her back on equipment unless circumstances required it. Bishop knew that dump truck drivers had a blind spot directly behind the truck. Bishop knew that she should not stand directly behind a dump truck with her back to it.

[6] On the day of the accident, Parks placed the backup alarm toggle switch in the "On" position. Bishop noticed that Parks's backup alarm was working properly all day. The accident occurred near the end of the work day. Parks pulled into the construction site and backed into the staging area. Bishop heard Parks's backup alarm as he backed up. Bishop went to either the driver side or the passenger side of Parks's dump truck and told him that he was the last truck of the day. Bishop jumped down from the truck and went to her post near the passenger side rear corner of Parks's truck.

[7] Parks saw that the excavator was not ready to load the truck. Parks got out of the truck and went to the back of the truck to talk to Bishop. Bishop came over to him behind the truck, and they stood there and talked. When Parks determined that the excavator was ready for him, he told Bishop that he had better go because the excavator was waiting on him. Bishop told him that she

would check for traffic first, but Parks did not hear her. Bishop understood that when Parks returned to his truck he planned to back up to the excavator.

[8] Parks got back into the truck. He did not see any other vehicles. He checked his mirrors and slowly started backing into the loading area. He did not see Bishop in his mirrors. He believed that Bishop was going back onto S.R. 62 by the construction barrels. Bishop was standing behind the truck with her back to it. She did not hear the backup alarm. The truck struck her right knee and right elbow and knocked her down, and the truck wheels ran over her. She heard her bones breaking. She screamed and pounded the tires. Parks heard screaming, so he stopped the truck, pulled forward, and got out to see what was wrong.

[9] O'Mara employee Regan Martin was operating a GPS near the excavator to determine road grade. Regan was about 150 feet away from the back of Parks's truck. He saw Parks come to the back of the truck and Bishop walk over to him. Parks and Bishop stood talking behind Parks's truck. Regan saw Parks walk back toward the cab. He saw Bishop standing behind the truck, with her back to it, looking down at something in her hands. She was standing in the vehicle's blind spot. Her stop sign was placed between her knees. Regan was not aware of any job function requiring Bishop to stand behind Parks's truck. Regan saw the truck's backup lights come on. He waived to warn Bishop, but she did not see him. He did not hear the backup alarm, but he could not have heard it from where he was standing. Regan ran toward Bishop and saw the truck run over her.

[10]     Judy Boldery was driving north on S.R. 62. She approached the construction site, which was on her left. Boldery saw Bishop at the rear corner of the truck behind the wheels. Bishop was facing away from the truck. Boldery saw the truck slowly back up, and Bishop suddenly went down. Boldery had her windows up and the radio on. Boldery did not hear the backup alarm. Boldery saw the truck stop on Bishop's legs and saw Bishop hitting the tires. Boldery heard Bishop screaming.

[11]     O'Mara employee James Martin was operating the excavator. In his side mirror, he saw Parks speaking with Bishop. The excavator had an alarm that went off whenever the excavator moved. At the time of the accident, James was repositioning the excavator, and therefore his alarm was sounding. James saw Regan running toward Parks's truck. Regan was yelling, "Call 911." Tr. at 390. James saw Bishop lying on the ground, and he called 911.

[12]     Parks was screened for drugs and the results were negative. Bishop's injuries included fractures of the right tibia, left femur, pelvis, ribs, and sacrum. She has had numerous surgeries related to her injuries. She continuous to require pain medication and is not expected to be able to return to her job.

[13]     O'Mara Safety Director Ted Westerman conducted an investigation of the accident. In April 2010, he received Bishop's written report of the accident, which she completed while she was still in the hospital ("Bishop's Hospital Statement"). Plaintiff's Ex. 36; Exhibit Vol. IX.

[14] Indiana State Trooper Nate Adams investigated the accident. He took photographs and interviewed Parks, Regan, Boldery, and Bishop. He interviewed Bishop by telephone in August 2010, a few months after the accident. He prepared a report that included the narrative accounts provided by Parks, Regan, Boldery, and Bishop ("the Crash Narrative"). Defendant's Ex. P; Exhibit Vol. XI; Appellant's App. at 106.

[15] Bishop filed a negligence action against Parks. Before trial, Parks filed a motion in limine to exclude the "contents of the Police Report completed by the investigating officer," which included the Crash Narrative, and "the testimony of the investigating officer regarding his opinion as to the fault allocated to either party." Appellant's App. at 32-33. Parks contended that Officer Adams's police report, which records the alleged observations of witnesses, was inadmissible hearsay. *Id*. at 38.[2] The trial court granted the motion. *Id*. at 43.

[16] A four-day jury trial was held. Among her eleven witnesses, Bishop called Westerman and through him submitted her Hospital Statement. Tr. at 166. Later, she called Officer Adams as a witness. She asked Officer Adams whether any of the witnesses that he interviewed during his accident investigation had told him that they heard Parks's backup alarm, and he answered no. *Id*. at 206-07. On cross-examination, Parks gave Officer Adams

---

[2] Parks wrongly asserts that his motion in limine was to exclude portions of the police report containing the officer's causation opinions. Appellee's Br. at 39. A review of his motion and the supporting memorandum reveals otherwise. Appellant's App. at 32, 38.

the Crash Narrative and asked him if he recognized it, and he said that he did. *Id*. at 208. Parks asked Officer Adams what the document was, and Officer Adams identified it as the Crash Narrative and explained that it contained the statements of the witnesses that he had interviewed. *Id*. at 208. Parks then went through each witness, statement by statement, asking Officer Adams whether that witness had made that statement, to which he replied affirmatively. At no point was any portion of Officer Adams's police report that referred to his opinion on causation discussed.

[17] Parks then offered the Crash Narrative into evidence. Bishop apparently objected to its admission, but much of the argument was inaudible and not recorded in the transcript. *Id*. at 213. Bishop acknowledged that the Crash Narrative was used for the purpose of refreshing Officer Adam's recollection. Bishop told the trial court that she had not brought up the police report because Parks had asked for it to be excluded in his motion in limine. Bishop stated that if the Crash Narrative was to be admitted, then for completeness the rest of the police report should be admitted. Parks argued that Officer Adams had already testified as to what each of the witnesses had told him and that his written account did not express his opinions about how the accident occurred. The trial court agreed with Parks and admitted the Crash Narrative but not any other part of the police report. *Id*. at 214. When Bishop conducted her redirect examination of Officer Adams, she questioned about what she had told him in the Crash Narrative. She did not question Officer Adams about any other portion of his police report or his opinion on causation.

When Parks cross-examined Bishop, Parks questioned her about the description of the accident in Crash Narrative. *Id*. at 364. Bishop objected, and the trial court overruled her objection. Bishop testified that she only vaguely recalled talking to Officer Adams, and that the account in the Crash Narrative did not make sense.

In closing argument, Parks discussed the differences among Bishop's trial testimony, her Hospital Statement, and the Crash Narrative. *Id*. at 605-06. Parks asserted that Bishop changed her story after she learned that Regan had seen the accident and saw her standing directly behind the truck. *Id*. at 606-07.

The jury found that Bishop was 80% at fault and that Parks was 20% at fault. The trial court entered judgment in favor of Parks. Bishop filed a motion to correct error and for a new trial, arguing that the Crash Narrative was inadmissible hearsay, was improperly admitted, and prejudiced her substantial rights. The trial court concluded that any error resulting from the introduction of the Crash Narrative was harmless and denied her motion. Bishop appeals.

## Discussion and Decision

Bishop argues that the trial court erred in admitting the Crash Narrative into evidence because it is hearsay and that its admission prejudiced her substantial

rights and was not harmless.[3]  "We review a trial court's denial of motion to correct error for an abuse of discretion, reversing only where the trial court's judgment is clearly against the logic and effect of the facts and circumstances before it or where the trial court errs on a matter of law." *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013).[4]  "We review a trial court's decision on the

---

[3]  Parks argues that Bishop waived this claim of error because her objection at trial was not specific enough. *See GKC Ind. Theatres, Inc. v. Elk Retail Investors, LLC.*, 764 N.E.2d 647, 651 (Ind. Ct. App. 2002) ("As a general rule, a party may not present an argument or issue to an appellate court unless the party raised that argument or issue to the trial court."). We disagree. Bishop objected that the Crash Narrative was excluded under the trial court's order in limine, and Parks had argued that it was inadmissible hearsay as the basis for its exclusion. Appellant's App. at 38. Therefore, Bishop's objection properly preserved her hearsay claim. Bishop concedes that she failed to properly preserve other claims of error connected with the Crash Narrative, and for these issues she argues that fundamental error occurred. *See Lehman v. State*, 926 N.E.2d 35, 38 (Ind. Ct. App. 2010) ("The fundamental error doctrine is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process."). In civil cases, we have limited the fundamental error doctrine to cases involving involuntary commitment and termination of parental rights. *Johnson v. Wait*, 947 N.E.2d 951, 959 (Ind. Ct. App. 2011), *trans. denied*. We decline to address Bishop's fundamental error claims because she has failed to show that the doctrine should be extended to cases that do not involve liberty interests or parental rights. *Id*.

[4]  Parks asserts that Bishop is appealing a negative judgment and thus is entitled to prevail only if the judgment is contrary to law, citing *Captain and Co., Inc. v. Towne*, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980). In *Captain*, another panel of this Court observed that the appellant's argument that the judgment was unsupported by the evidence was unavailable to one who had the burden of proof at trial. *Id*. However, *Captain* was not an appeal of a motion to correct error. In *Walters v. Dean*, 497 N.E.2d 247 (Ind. Ct. App. 1986), we dealt with such an appeal and explained,

> In his motion to correct errors, Walters asserted the judgment was erroneous because it was contrary to the evidence. Because Walters is appealing from a negative judgment, he cannot challenge the sufficiency of the evidence to sustain the judgment. Rather, he may only challenge the judgment as being contrary to law. This means we may reverse only where the evidence is uncontradicted and leads unerringly to a conclusion different from that reached by the trial court.

*Id*. at 249 (citations omitted). *See also, e.g.*, *Smitley v. Egley*, 156 Ind. App. 10, 12, 294 N.E.2d 640, 641 (1973) (Where the motion to correct error seeks to assign as error that the court's decision is contrary to the evidence and based on insufficient evidence, there is no issue for appellate review inasmuch as the denial of the underlying action was a negative judgment.).

Here, in her motion to correct error, Bishop argued that the trial court erred by admitting the Crash Narrative. Therefore, *Walters* does not apply and we will review the denial of Bishop's motion to correct error for an abuse of discretion.

admissibility of evidence for an abuse of discretion, which occurs when the decision is against the logic and effect of the facts and circumstances before the court." *Duneland Properties, LLC v. N. Indiana Pub. Serv. Co.*, 14 N.E.3d 95, 102 (Ind. Ct. App. 2014). However, any error in the admissibility of evidence will not be grounds for reversal unless it affects the substantial rights of a parties. Ind. Trial Rule 61. "'Further, any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection.'" *Green River Motel Mgmt. of Dale, LLC v. State*, 957 N.E.2d 640, 646 (Ind. Ct. App. 2011) (quoting *R.R. Donnelley & Sons Co. v. N. Texas Steel Co.*, 752 N.E.2d 112, 127 (Ind. Ct. App. 2001), *trans. denied* (2002)). "To determine whether the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the jury." *Sibbing v. Cave*, 922 N.E.2d 594, 598 (Ind. 2010).

[23] We need not determine whether the Crash Narrative was inadmissible hearsay because we conclude that it was cumulative of other evidence submitted without objection and did not prejudice Bishop's substantial rights.[5] Bishop's Hospital Statement, which she herself submitted, contained virtually an

---

[5] Bishop argues that sending the Crash Narrative back to the jury room was prejudicial error. Our review of the record shows that she only objected to the admission of the Crash Narrative during Officer Adams's cross-examination and to Parks's use of it during his cross-examination of Bishop. In addition, Bishop's assertion that it was sent back to the jury room is not supported by citations to the record, and therefore her argument is insufficiently developed and waived. *See Whaley v. State*, 843 N.E.2d 1, 18 n.15 (Ind. Ct. App. 2006) ("Failure to put forth a cogent argument acts as a waiver of the issue on appeal."); Ind. Appellate Rule 46(A)(8)(a) (providing that each contention must be supported by cogent reasoning and citations to the record relied on).

identical description of the accident that is recorded in the Crash Narrative. Both descriptions included the following statements in the same order: Parks was Bishop's last truck; he was not ready to be loaded; Bishop was on the passenger side of the truck talking to him; he was ready to be loaded, so she jumped down to check on traffic; she told Parks to sit tight so that she could check on traffic; there was no traffic so she turned to let Parks know that it was clear; the truck hit her; she did not hear Parks's backup alarm. Plaintiff's Ex. 36; Exhibit Vol. IX (Hospital Statement); Defendant's Ex. P; Exhibit Vol. XI; Appellant's App. at 106 (Crash Narrative). The only difference, and a very minor one, between the two descriptions of the accident is that the Hospital Statement included an additional phrase, which is that Bishop told Parks that she would check on traffic "so she could back him up to the machinery." Plaintiff's Ex. 36, Exhibit Vol. IX.

[24] In addition, Regan and Boldery had both already testified before the Crash Narrative was admitted, and their testimony was consistent with that in the Crash Narrative. Finally, Officer Adams had already testified without objection to the contents of the Crash Narrative. Thus, the Crash Narrative was merely cumulative of other evidence that had already been properly admitted and did not prejudice Bishop's substantial rights. *See Sibbing*, 922 N.E.2d at 598 (concluding that erroneous admission of plaintiff's testimony regarding what her doctor told her about her injuries was harmless, where that evidence was also admitted through other medical treatment records and plaintiff's medical witness); *Davis v. Garrett*, 887 N.E.2d 942, 947 (Ind. Ct. App.

2008) (concluding that admission of police report was harmless error, where witness had already testified to precisely same information that was contained in report before it was admitted), *trans. denied*. Therefore, we affirm the judgment.

Affirmed.

May, J., and Bradford, J., concur.